



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

TAK ASANUMA,

Plaintiff,

v.

UNITED STATES OF AMERICA; and ANNETTE VAIPULU; and DOES 1-100

Defendants.

Civil Case No. 12cv0908 AJB (WMC)

FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.

## The Action

This is a negligence action under the Federal Tort Claims Act for the personal injuries suffered by Plaintiff Tak Asanuma on May 5, 2010. Plaintiff Tak Asanuma suffered injuries after he was involved in a collision while riding a bicycle. The pleadings which raise the issues are (1) Plaintiff's First Amended Complaint (ECF No. 7), and (2) Defendant's Answer (ECF No. 8).

## II.

## Jurisdiction and Venue

Federal jurisdiction is invoked under 28 U.S.C. §1346(b)(1). Venue is proper

because all conduct giving rise to the claims alleged in the complaint occurred in San Diego County.

## III.

## <u>The Proceedings</u>

Prior to trial, the Court excluded the proffered testimony of Dr. Lobatz on the issue of Plaintiff's comparative negligence due to his failure to wear a bicycle helmet at the time of the accident. The Court ruled, as better reflected in the transcript of the proceedings, that the testimony was excludable under Rule 702 and *Daubert* requirements. The testimony would have been unsupported by any accident reconstruction or details about the angles of impact, the force of impact, and the integrity of plaintiff's helmet, among other things.

The case proceeded to trial on February 24, 2014 and concluded on March 3, 2014. The issues tried were set out in the Final Pretrial Order in this case. (ECF No. 25). Following the trial, and upon review of the testimony and documentary evidence, the agreed facts, the arguments of counsel, and the relevant legal authorities, the Court now makes the following findings based on the credible evidence and their reasonable inferences to be drawn therefrom. These findings were made based upon a preponderance of the credible evidence. Causation was determined using the "substantial factor test" under California Law. *See*, *Mitchell v. Gonzales,* 54 Cal. 3d 1041 (Cal. 1991); Restatement (Second) of Torts §431. "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm." CACI 430.

Any finding of fact which is more appropriately a conclusion of law is to be deemed as such.

## IV.

## <u>Findings of Fact</u>

The following facts were admitted by the parties and are adopted by the Court

as findings of fact.[1/]

1. On May 5, 2010 Plaintiff Tak Asanuma was riding his bicycle on the 2100 block of Abbott Street in the City of San Diego, California.

2. Plaintiff was not wearing a bicycle helmet during this time.

3. Annette Vaipulu was a federal employee, as she was employed as a Census Bureau Crew Leader at this time by the United States.

4. Ms. Vaipulu was sitting inside a 1992 Toyota 4Runner that was parked on Abbot Street when she opened the driver's side rear door. Immediately thereafter Plaintiff collided with the open door. Plaintiff hit his head and suffered trauma.

5. Plaintiff was taken to UCSD medical center for treatment for his injuries.

6. Plaintiff had severe spinal stenosis and spondylosis prior to the accident of May 5, 2010.

7. Plaintiff had psychiatric issues which included bipolar disorder from an early age, prior to the May 5, 2010 accident.

8. Plaintiff has had frequent treatment from May 5, 2010 through the present time for injuries to several areas, including to his head, neck and back.

9. Plaintiff underwent surgery on his neck, a laminectomy, to treat his cervical stenosis on October 18, 2012.

10. Plaintiff was unemployed at the time of the accident, and had not been employed since prior to 2000.

11. Plaintiff was receiving Social Security Disability ("SSD") benefits at the time of the accident as a result of his psychiatric issues. Included in his SSD benefits was Medicare coverage for medical treatment.

12. According to Medicare records, the medical expenses paid to date by

---

[1/] The facts are taken verbatim from the Parties' Proposed Pretrial Order, unedited, signed, and filed by the Court on September 30, 2013. (Doc. No. 25.)

Medicare for Plaintiff's medical treatment is $30,959.16.

13. According to Medicare records, the amount paid for Plaintiff's surgery of October 18, 2012 was $9,554.33.

The Court further finds based on a preponderance of the credible evidence, the following:

14. Defendant, by and through its employee, Annette Vaipulu, was negligent in opening her car door and causing a collision with Plaintiff.

15. Plaintiff suffered injuries in the accident including: an intracranial hemorrhage, a fracture of the temporal bone, a fracture of the zygomatic arch, an inner ear injury with associated mild to moderate hearing loss, a sprain to the cervical spine, and a reactive/situational depression associated with these injuries. Plaintiff also suffered post traumatic headaches and dizziness.

16. Plaintiff did not suffer an occipital condyle fracture (alar ligament avulsion fracture) as a result of the accident.

17. Prior to the May 5, 2010 accident, Plaintiff suffered from spinal stenosis and spondylosis, which was being medically cared for through the University of California, San Diego ("UCSD") health system.

18. The progression of the Plaintiff's underlying spinal stenosis and spondylosis ultimately required a C3-C7 laminectomy to relieve spinal cord compression.

19. The May 5, 2010 accident, did not contribute, as a substantial factor to the cause of or need for the C3-C7 laminectomy.

20. Plaintiff would have required surgery to treat his spinal stenosis and spondylosis at some point, even if the May 5, 2010 accident had not occurred.

21. Plaintiff will require a fusion surgery for his neck at some unknown time in the future.

22. The need for a future fusion surgery is not caused by the accident in question.

23. The May 5, 2010 accident did not aggravate plaintiff's pre-existing bi-polar disorder.

24. The May 5, 2010 accident, did cause plaintiff to suffer post traumatic reactive/situational depression as a result to the physical injuries suffered. This depression was significant during the eighteen months of vertigo, but following the resolution of the vertigo, any situational depression currently is accounted for on physical limitations not caused by the accident.

25. Plaintiff has been found totally disabled since 2000 by the Social Security Administration as a result of his psychiatric issues.

26. Plaintiff did not establish a reasonable probability that he would have returned to any type of work or gainful employment but for the accident. To the contrary, the evidence supports a finding that it would have been improbable for him to return to work based on his ten (10) year psychiatric disability. Other than vague testimony of a future goal, no details, plans, or prospects were described. As a result, no loss of employment, loss of earning capacity, or loss of future financial gain has been established.

27. No evidence was presented for the costs of future care related to the reactive/situational depression which has been subsumed in the ongoing care for his bipolar disorder.

**IV.**

**Conclusions of Law**

1. Defendant's employee, breached the ordinary duty of care, when she opened her car door into the oncoming path of Plaintiff; as a result, this negligence caused a collision and resultant injuries and damages to

Plaintiff.

2. Plaintiff was not comparatively negligent in causing the accident and resultant injuries.

3. Plaintiff's damages are assessed at $21,404.53[2/] for medical expenses to date.

4. Plaintiff failed to establish the cost of any future medical expenses for the injuries caused by the subject accident.

5. Plaintiff failed to establish any loss of income, earning capacity or prospective economic gain, and damages therefore.

6. The reasonable value of non-economic loss for pain and suffering to date is $250,000.

7. The reasonable value of future non-economic loss for pain and suffering to date is $100,000.

8. Plaintiff is entitled to a judgment against Defendant in the total amount of $371,404.53.

## V.

## Discussion

The accident of May 10, 2010 was caused by Defendant's employee opening her rear driver side door into on coming traffic, which resulted in a collision with Plaintiff who was riding his bicycle along Abbott Street, in Ocean Beach on that date.

---

[2/] While the medical expenses were billed at nearly ten (10) times this amount, the actual amount paid is the appropriate measure of damage. *Howell v. Hamilton Meats and Provisions, Inc.*, 52 Cal. 4th 541 (Cal. 2011). Additionally, evidence of medical expenses that were not actually paid is irrelevant in determining future damages or non-economic damages. *Hill v. Novartis Pharm. Corp.*, 944 F. Supp. 2d 943 (E.D. Cal. 2013). *Corenbaum v. Lampkin*, 215 Cal. App. 4th 1308 (Cal. 2013).

The Court finds that Defendant's employee was negligent for the subject collision. Upon impact with the vehicle door, Plaintiff crashed to the ground, striking his head. No evidence was admitted with regard to the forces of impact between Plaintiff and the ground.

Following the incident, Plaintiff was diagnosed, at UCSD Hospital, with having suffered a blunt head trauma and resulting right temporal fracture, a fracture of the zygomatic arch, an intracranial hemorrhage, with blood in the inner ear, a sensorineural hearing impairment, and trauma to the neck. A questionable alar ligament avulsion fracture was seen on diagnostic studies.

Plaintiff was treated conservatively following the accident. Ultimately, in October of 2012, Plaintiff had a laminectomy at the C3-C7 levels of his cervical spine to relieve the symptoms of cervical spinal cord compression. His psychological symptoms of depression worsened from his pre-existing state and ongoing psychological care was provided in conjunction with the care provided for his pre-accident depression and bipolar personality disorder. The blunt trauma to the head and resulting traumatic brain injury resulted in symptoms including vertigo, daily headaches, dizziness and balance problems.

There is no question that the closed head injury with the skull fracture, facial fracture and inner ear injury were caused by the accident. The attendant vertigo was also caused by the accident. The vertigo was destabilizing to Plaintiff's ability to function and took approximately eighteen (18) months to resolve. There is also no question that Plaintiff suffered a post accident depression associated with his injuries and reduced functions. This is distinguished from an exacerbation from a pre-existing bipolar depression that plaintiff suffered from historically. This distinction will be discussed in more detail below.

The nature and extent of the injury to the cervical spine and the required care, including surgery, was the subject of competing testimony. The same can be said of the psychological injuries with psychiatric experts holding different views on the

extent to which the pre-existing psychological state was exacerbated and for how long.

Plaintiff had a well documented pre-existing cervical spondylosis and chronic radiculopathy that was under doctor's care in the months before the accident. Dr. Weinstein found that a decompression of the cervical spine was warranted if the presence of myelopathy (injury to the spinal cord) were presented. Plaintiff's symptoms emanating from the cervical spine were considered radicular (emanating from a nerve root compression). Plaintiff also suffered from a bipolar psychological condition with associated depression, for ten (10) years or more that was managed by treating psychiatrists.

The Court concludes that Plaintiff had severe arthritis in his neck, with stenosis of the spinal canal that was producing symptoms due to cord compression. While these symptoms were considered to be radicular, and not a product of spinal cord compression, the testimony of the spine specialists makes it clear that the symptoms of spinal stenosis (myelopathy) will mimic or imitate nerve root compression. A careful review of Plaintiff's total medical history, except for a period of increased pain post accident, shows his condition was not otherwise exacerbated. Indeed, the evidence contraindicates a spinal column injury at the time of the accident.

To draw this conclusion, the Court carefully analyzed the medical records for the thirteen (13) years provided by counsel, (ten (10) years pre accident and three (3) years post accident). What is surprisingly lacking is any current medical assessment of Plaintiff's symptomology. Only the testimony of Plaintiff related his current status medically. The last medical reviews occurred in early 2013.

The record is clear that in early 2010 Plaintiff was suffering from symptoms associated with his spinal stenosis. The symptoms were radicular for the most part, indicating nerve root compression, and likely myelopathy (injury to the spinal chord). Over the years, low back pain and radicular pain into the buttocks was also noted. Multiple sites of radiculopathy would be suggestive of myelopathy related to spinal

cord compression.

While Plaintiff had symptoms related to his cervical spine as early as 2003, the period from 2008 through 2010 are the most meaningful on this issue of causation

On January 22, 2008, Plaintiff reported a problem of neck/trapezious pain on the left with radiation to the left hand for the past three weeks. (J2-431.) Physical therapy was offered but declined in favor of home stretching. In a follow-up on March 21, 2008, Plaintiff reported continued discomfort to his neck and upper back. He complained of some numbness and tingling of the hands as well as lower back pain with some radiation to the buttocks. There were periodic visits throughout the remainder of 2008 and 2009 with these general symptoms with the addition of bilateral shoulder pain and discomfort. Several of these are notable as they illuminate the issues with regard to causation. On June 2, 2008, Dr. Rosas notes that Plaintiff continues to be quite active and is able to surf for about an hour without too much problem in a non-related knee issue. However, Plaintiff noted concern about some tingling to his left hand that had been present for at least three months. (J2-439.)

In a subsequent therapy visit on June 23, 2008, Plaintiff noted that he had been surfing "more actively - 45 min. - 1.5 hours - day, no pain while surfing, but starts afterwards." Pain was described as achy and sharp radiating to the upper neck and anterior shoulder. The doctor's note for that visit states, "pain exacerbated by surfing, lifting; nothing makes better." (J2-441)

In a November 20, 2008 note, Dr. Willard writes, "New complaint of left arm numbness: Has baseline numbness in thumbs and fingers 2-4, attributed to nerve impingement at neck. Recently noted extensive left arm numbness-from shoulder to fingers-lasting fifteen minutes to 1 hour, occurring while paddling (pt avid surfer)." (J2-463.) While complaints of left arm symptoms was not new at this point, this may be a qualitative statement.

By December 8, 2008, bilateral shoulder pain was the subject of evaluation. The pain was described as occurring mostly "after he surfs, which he does almost on a

daily basis." (J2-469.) A pattern is develops, showing that while the surfing activity was therapeutic for his psychological condition, it forms a logical reason for upper extremity and cervical symptoms.

Cervical related symptoms became a particular focus again on January 7, 2010, when Plaintiff again complained of numbness in the left arm starting in his shoulders and radiating to the fingers. Plaintiff advised the doctor that he was surfing almost on a daily basis, but he "has been having trouble with some tingling and numbness in his left upper extremity associated with neck discomfort." (J2-509-512.) The diagnosis of cervical radiculopathy was discussed and x-rays of the cervical spine confirmed pre-existing degenerative joint disease with possible encroachment of the left C6 region. An MRI was ordered. The MRI results were discussed with Plaintiff on February 5, 2010. (J2-513-515.) A surgical consult was ordered with Dr. Rojas noting that the patient "has fairly severe spinal stenosis." Dr. Weingarten did the surgical consult on March 19, 2010. (J2-518). The doctor confirmed Plaintiff's reports of a two year history of neck pain, with mild paresthesias of the left shoulder once the shoulder paresthesias began, Plaintiff also reported numbness of the lateral arm and radial forearm, and also the complaint of right hand numbness, particularly in the first three digits. Dr. Weingarten noted that the MRI showed multi level changes in the cervical spine that would "warrant decompression in the presence of any evidence of myelopathy." The symptoms were accounted for as nerve root related, however, in hindsight, these were equally likely related to spinal cord compression that was demonstrated on the January 2010 MRI. Physical therapy was recommended at that point.

The therapy note of April 19, 2010 (J2-523 to 525) records Plaintiff's subjective complaints of neck and bilateral radicular symptoms down into both arms, hands and fingers along with constant tingling in the fingers. The accident then followed.

Of particular note with regard to the accident, was the questionable condylar

fracture. This factor was significant to Plaintiff's orthopaedic expert, Dr. Tontz, who felt it was evidence of severe injury to the cervical spine. However, the evidence preponderates in favor of finding that the artifact found on the MRI was not an avulsion fracture, but rather an osteophyte resulting from the severe degenerative arthritis in the spine. As the defense expert indicated, the image of the body in the spinal column lacked the physical presentation of an avulsion fracture (with a jagged edge) and an injury of that type would have produced immediate and severe neurologic deficit and pain. It did not.

In a note dated May 6, 2010, the day after the accident, Plaintiff was neurologically intact on exam. (J2-529.) When Dr. Santman evaluated Plaintiff on May 8, 2010, for chief complaint of neck pain, Plaintiff noted that the radicular symptoms felt at the time of the accident had resolved to now simply a sore sensation in the left deltoid. (J2-530.) No numbness or tingling were described with regard to either upper extremity, and there was no bowel or bladder dysfunction. Additionally there was no loss of dexterity or fine motor skills (Id.) None of these would be consistent with cord compression caused by a frank injury to the spinal column at the time of the accident, or any exacerbation of the underlying spinal cord stenosis. The x-rays reviewed by Dr. Santman confirmed the pre-existing severe spondylosis throughout the cervical spine including a spontaneous fusion of a few of facet joints posteriorly. The small fleck of bone, discussed earlier, was noted. The continuation of the use of a hard cervical collar was recommended and future flexion/extension x-rays of the cervical spine were anticipated in the weeks ahead. (J2-531.)

Dr. Santman did a follow-up on June 19, 2010. (J2-546 to 548). The doctor reported no change in handwriting or fine motor abilities and no evidence of neurologic deficit was noted. Cervical flexion/extension x-rays ordered on May 21, 2010, showed no pathologic motion according to the Plaintiff's orthopaedic expert.

By August 11, 2010, the physical therapist reported that Plaintiff had returned to surfing, but dizziness was a factor. (J2-563.) In a physical therapy note of August

31, 2010, the Lhermite's sign was first recorded. This occurred with the onset of numbness in both upper extremities and trunk with flexing neck to look down. Some ligamentous instability of the cervical spine was also noted. (J2-567.)

Dr. Rojas next evaluated the patient on August 31, 2010, noting the numbness to the mid-abdomen associated with flexion of the neck, but otherwise stating that no numbness or weakness of the upper extremities occurs unless he does a forced flexion of the neck. (J2-569.) On September 1, 2010, Dr. Rojas reviewed new x-rays which noted a loss of the normal cervical lordosis, minimal anterolisthesis of the C2 and C3 which does not change with motion, and a mild C4 on C5 rethrolisthesis which does not change on motion. A mild retrolisthesis of C5 on C6 reduces with flexion.

Plaintiff's medical treatment continued, all the while focused in large part on the symptoms associated with the inner ear injury and its resultant vertigo. By October 20, 2010, the therapist was reporting improvement in the trunk tingling symptoms (J2-587) and on November 3, 2010, (J2-596) Plaintiff was able to return to surfing for 30 to 40 minutes and was encouraged to "tolerate surfing 60 minutes" along with continuing other forms of therapy.

Plaintiff's treatment continued into 2011, and remained predominated by issues associated with dizziness. Throughout this time, Plaintiff was using a cervical traction device. An MRI of July 11, 2012 is reported in the record (J2-834) as showing a slight progression of the multi-level degenerative changes of the cervical spine. This is now 29 months post accident, and an assessment of cervical stenosis with myelopothy was made. This results in the multi-level laminectomy that was later performed.

The overall assessment of these records reveal that the immediate impact of the accident caused some immediate but short lived increase of the cervical spine symptoms, and that Plaintiff's medical needs and symptoms were predominated by the head and inner ear injuries. For well over two yeas, Plaintiff received conservative care that did not suggest any immediate onset of frank neurologic

symptoms warranting surgery. The Court concludes that, at best, soft tissue injuries to the cervical spine were sustained in the accident but the development of a significant degree of myelopothy in 2012 was the result of the advancing degenerative changes that have been a feature in plaintiff's medical status for almost thirteen (13) years at that point. The onset of the pre-accident neurologic signs and symptoms appears associated with the active increase in the amount of surfing plaintiff was involved in. Clearly, the neck flexion and extension required in that activity was symptom inducing. It is notable that during the active treatment phase from May to August 2010, cervical spine related symptoms were less a factor, but when the surfing regimen picked up, pain and paresthesias returned. At this point, the cervical spine appears to be back to its pre-accident condition. Though vulnerable, it was Plaintiff's active lifestyle acting upon his long standing chronic cervical spine disease that precipitated the need for surgical intervention.

While the medical care for the multi-disciplinary treatment through the UCSD system in the amount of $21,404.83 was reasonable, necessary and compensable to plaintiff, the costs of the surgery are not. Plaintiff is entitled to recover the former sum.

Without establishing that the cervical surgery was legally caused by the subject accident, the postoperative cervical instability and kyophosis of the cervical spine which now warrants a cervical fusion, are similarly not compensable. Nor would any situational depression associated thereto.

Plaintiff did suffer, however, greatly with regard to the head injury, and the inner ear injury as a direct result of the accident. The Court places damages for the pain and suffering associated with those injuries to the present time in the amount of $250,000.00. Moving ahead, Plaintiff will continue to have hearing loss and the likelihood of some vestibular disturbance/dizziness on an intermittent basis far less limiting than the vertigo experienced immediately post accident, although the evidence was unclear in this regard. The costs of care of those items is less clear as

there was a lack of evidence with regard to Plaintiff's current status and a lack of any testimony with regard to prognosis.

The situational depression related to the accident is minimal at this point with the cervical symptoms dominating Plaintiff's life. In any event, ongoing psychological care is now based on treatment of the underlying and unaffected bipolar disorder. Assessing the information, however, the Court awards $100,000.00 for future pain and suffering associated with the injuries, predominately the right sided hearing loss, and the limitations they bring to this now sixty year old man.

**CONCLUSION**

Based on the foregoing, the Court finds in favor of the Plaintiff and against the Defendant United States of America, and awards Plaintiff damages in the amount of $371,404.83. The Clerk of Court is directed to enter judgment according to this order.

IT IS SO ORDERED.

DATED: March 28, 2014

Hon. Anthony J. Battaglia
U.S. District Judge